UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

―――――――――――――――――――――――――

MICHAEL ROBERT UPDIKE,

               Plaintiff,

     -vs-

CAROLYN COLVIN, Commissioner of
Social Security,

               Defendant.

―――――――――――――――――――――――――

**DECISION and ORDER
No. 6:12-CV-6506(MAT)**

## I.   Introduction

Plaintiff Michael Robert Updike ("Plaintiff"), represented by counsel, brings this action pursuant to Title  XVI of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his application for Social Security Insurance ("SSI"). This Court has jurisdiction over the matter pursuant to 42 U.S.C. §§ 405(g), 1383(c). Presently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## II.  Procedural History

On March 11, 2009, Plaintiff protectively filed an application for SSI, alleging disability beginning October 13, 2004, which was later amended to March 11, 2009. T.32. The application was denied on June 14, 2009, and Plaintiff timely filed a written request for a hearing. Administrative Law Judge Susan Wakshul ('the ALJ")

presided over the hearing, which was held via videoconference on August 5, 2010. Plaintiff was absent from the hearing, but his attorney, Gregory Fassler, Esq., appeared.

On August 16, 2010, the ALJ sent Plaintiff a Notice To Show Cause For Failure To Appear, T.125-30, directing him to show good cause for his absence. Plaintiff was informed that if ALJ found his explanation to be good cause, she would hold a supplemental hearing. By letter dated August 25, 2010, Plaintiff replied to the ALJ, stating that he did not appear at his hearing because he was "overwhelmed and harried" and had to care for his parents. T.131. Finding that Plaintiff failed to establish good cause, the ALJ did not set a new hearing date.

The ALJ issued an unfavorable decision on September 23, 2010, finding that Plaintiff was not disabled. T.10-27. On July 23, 2012, the Appeals Council denied Plaintiff's request for review, T.1-4, making the ALJ's decision the Commissioner's final decision.

III. **Summary of the Administrative Record**

A.   **Medical Evidence**

On April 28, 2008, a magnetic resonance image ("MRI") of Plaintiff's left knee revealed a small effusion in the patellofemoral compartment but no evidence of a meniscal tear. T.296. In November 25, 2008, Plaintiff saw his physician at the Anthony L. Jordan Health Center ("the Health Center") to request Oxycontin and Percocet for carpal tunnel syndrome (secondary to

right shoulder surgeries) following a recent fall from a ladder. T.348, 351.

On March 19, 2009, Plaintiff returned to the Health Center for refills of Xanax, Norco, Ambien, Prozac, Adderall, Flonase, and Flexeril. T.350. The only clinical finding made was "limited back ROM [range of motion]." Id. Plaintiff explained that he wanted to increase his narcotic pain medication dosage so that he would not have to return to the doctor as often. T.353. He alleged shoulder/back pain but there were no objective findings on examination. The health care provider (whose signature is illegible) "suspect[ed]" Plaintiff was exhibiting "drug-seeking behavior". T.352. On March 20, 2009, Plaintiff went to the Health Center seeking more Xanax and Norco; when his request was denied, he became verbally confrontational, abusive, and loud. He stated that he was no longer going to be a patient at the Health Center and was going to go the Pain Center instead.

On April 7, 2009, Plaintiff returned to the Health Center, seeking more narcotics. T.354. His request was denied "due to no ongoing pt. doctor relationship & lack of objective medical evidence of need for chronic narcotics." T.354 (emphasis in original).

On May 7, 2009, Plaintiff was examined by consultative physician Dr. Karl Eurenius at the request of the Social Security Administration ("the SSA"). T.356-62. Plaintiff told Dr. Eurenius

-3-

that he had been a bodybuilder most of his life, which Dr. Eurenius noted was apparent based on Plaintiff's gait, general movements, and musculature. T.356. Plaintiff complained of bilateral knee and shoulder pain and described his daily activities as cooking, laundry, showering, dressing himself, watching television, and listening to the radio. T.357. On examination, Plaintiff had a normal gait and stance. He was "extremely well-tanned and ha[d] a very highly developed musculature." He was able to squat fully with some low to mid-back pain and used no assistive devices. T.357. His cervical spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally although Plaintiff noted that he felt pain in the posterior neck, particularly with full rotation to the left. T.358. His lumbar spine showed full flexion to 90 degrees, with pain felt in the lower mid-back without radiation; full extension; full lateral flexion bilaterally; and full rotary movement bilaterally. Straight leg raise ("SLR") testing was positive at approximately 20 degrees bilaterally with pain felt in the lower mid-back. This result was reproduced while sitting. Plaintiff had full range of motion bilaterally in his shoulders, elbows, forearms, and wrists. He also had full range of motion of the hips, knees, and ankles bilaterally. Strength was full (at 5/5) in the upper and lower extremities. T.358-59. Plaintiff's joints were stable and nontender, and he had full grip strength.

Dr. Eurenius diagnosed chronic bilateral knee and shoulder pain, probable ligament disease, and "bipolar disorder with anxious and panic attacks per [Plaintiff]." T.359. Dr. Eurenius opined that Plaintiff was "moderately" limited in climbing more than 2 flights of stairs; kneeling; lifting more than 20 pounds; and carrying more than 40 pounds, due to chronic bilateral knee pain. Id. Dr. Eurenius believed Plaintiff's condition was "stable". T.359.

Also on May 7, 2009, Plaintiff was examined by consultative psychologist Adele Jones, Ph.D. T.363-66. Plaintiff reported being driven to the appointment by his parents with whom he lived. T.363. Plaintiff stated that he had 7½ years of college without a degree, and had only held down short-term jobs. He stated that he felt "angry and a little anxious"; no other psychiatric symptoms were reported. T.363. Plaintiff was able to care for his personal needs, cook, prepare foods, clean, launder, and drive. T.365. He claimed not to be able to manage his money and had never had to take public transportation. He had good relationships with his family and liked to work out. He spent his days watching television. T.365.

On examination, Dr. Jones found Plaintiff cooperative with a "somewhat poor manner of relating". T.364. His eye contact was appropriate and his speech was fluent. His thought processes were tangential but concrete. His affect was full range and his mood was "angry and anxious". Plaintiff's attention and concentration were intact with counting, simple calculations, and serial 3s. However,

his recent and remote memory skills were mildly impaired due to anxiety during the evaluation. T.364. Dr. Jones believed Plaintiff's intellectual functioning was below average.[1] T.365. She found his insight to be fair and his judgment, adequate. For her medical source statement, Dr. Jones opined

> He can appear to maintain attention and concentration, make appropriate decisions, and appropriately deal with stress. He cannot follow and understand simple directions, learn new tasks, or perform complex tasks independently. It is unclear if he can perform simple tasks independently or relate adequately with others. He appears to be able to maintain a regular schedule with his parents help. The difficulties are caused by cognitive deficits and psychiatric problems. The results of the examination appear to be consistent with psychiatric and cognitive problems, and this may significantly interfere with the claimant's ability to function on a daily basis.

T.365.

Dr. Jones' diagnoses on Axis I were "deferred" and "rule out schizoaffective disorder"; her diagnosis on Axis II was borderline intellectual functioning. T.365.

Plaintiff began seeing Dr. Melanie Conolly from Unity Family Medicine at Spencerport ("Unity") on May 22, 2009, for knee and low back pain which was aggravated by bending and lifting. T.398. Plaintiff also reported that he had bipolar disorder, and that it was somewhat difficult for him to meet home, work, and social

---

[1]

This conclusion is belied by Plaintiff's lengthy letter of apology to the ALJ in response to the Notice To Show Cause. Although it is somewhat expansive and rambling, it was written using proper grammar and vocabulary appropriate to a person who has had some college education. T.131.

obligations. T.398. He had not seen a psychiatrist recently. T.398. On examination, Plaintiff's affect was labile and negative for anhedonia. Plaintiff did not exhibit compulsive behavior or obsessive thoughts, although he had poor insight and judgment and poor attention span anc concentration (characterized as concentration disjointed). Dr. Conolly noted that Plaintiff had very tangential, rapid speech, with flight of ideas. T.399. She referred him to Dr. Evelyn Brandon for outpatient mental health treatment. T.400.

Plaintiff saw Dr. Conolly again on June 19, 2009, complaining of continued low back pain. T.395. On examination, Plaintiff's affect was labile and negative for anhedonia, and he was not anxious or euhporic or fearful.  T.396. Dr. Conolly diagnosed bipolar disorder, not otherwise specified. Plaintiff continued with his prescriptions for Xanax, Prozac, and Adderall XR.

On July 15, 2009, Plaintiff saw Dr. Conolly and complained of compulsive thoughts, poor concentration, and indecisiveness and back pain. T.392. Dr. Conolly noted that he had normal insight and normal judgment, did not exhibit anhedonia, was not fearful or anxious, was not forgetful or having memory loss, did not have mood swings, obsessive thoughts, or hopelessness.  T.393-94.  He did have poor attention span and concentration and pressured speech. T.393.

On August 10, 2009, Plaintiff returned to see Dr. Conolly for hypertension and a rash on his back. T.389-90. On examination, Plaintiff was in no apparent distress. T.390. Lumbar palpation revealed bilateral tenderness. His extremities appeared normal. Plaintiff was not anxious, did not exhibit compulsive behavior, was not euphoric or fearful, had no mood swings, and had normal insight and judgment, although he did have flight of ideas. T.390. Dr. Conolly opined that Plaintiff was "doing well on current meds" for his bipolar disorder. T.389.

On September 2, 2009, Plaintiff saw Dr. Conolly, stating that he was having compulsive thoughts and behaviors. T.430. Plaintiff's physical examination was essentially normal. Dr. Conolly characterized his bipolar disorder as chronic. T.431.

A physical examination on September 17, 2009, by orthopedist Michael Maloney, M.D. revealed that Plaintiff's bilateral knees had stable ligamentous testing. T.458. Dr. Maloney noted that the severity of Plaintiff's pain complaints seemed to be somewhat out of proportion to the clinical examination findings. T.458. Though Plaintiff seemed to be "somewhat adamant about his need for surgical intervention," Dr. Maloney concluded that Plaintiff was not a surgical candidate for his alleged knee pain at that time. T.458.

Plaintiff returned to Dr. Conolly on September 23, 2009, and reported that exercise and medication relieved his depression

-8-

symptoms, which were aggravated by lack of sleep. T.433. He continued to complain of "fluctuating", "intermittent" low back pain, however. Plaintiff's physical examination was essentially normal. T.435. Psychiatrically, he exhibited "[n]o unusual anxiety or depression." T.435. Dr. Conolly noted that Plaintiff's bipolar disorder was "well controlled." T.433.

On November 9, 2009, Dr. Conolly saw Plaintiff and reported that with regard to his bipolar disorder, Plaintiff was "doing well" and that his "mood [was] stable on meds." T.441. There was "[n]o unusual anxiety or evidence of depression." T.442. Plaintiff continued to complain of knee and back pain, however. T.441. He described it as an "ache" and denied aggravating factors. T.441. He noted his "meds [were] working well." Id.

On December 7, 2009, Plaintiff saw Dr. Conolly, complaining of anxious and fearful thoughts, manic episodes, poor concentration, indecisiveness, restlessness, and sluggishness. T.444. On examination, Dr. Conolly found that he had a labile affect but no anhedonia; was not anxious; did not exhibit compulsive behavior; had normal knowledge and language; was not euphoric or fearful; did not have flight of ideas; was not forgetful; and had normal insight and judgment. He did have mood swings and pressured speech. T.445. Dr. Conolly noted that Plaintiff had been "[c]ompliant with [his] current therapy." Id.

-9-

On December 30, 2009, Plaintiff saw Dr. Conolly, complaining of anxiety, fearfulness, and poor concentration. His back pain was "stable" and was aggravated by bending and lifting. His insomnia was well-controlled on his current medications. Psychiatrically, Plaintiff had a labile affect, did not display anhedonia, was not anxious, and did not exhibit compulsive behavior. He did have mood swings and pressured speech. Dr. Conolly noted that he maintained compliance with his current therapy. T.448.

Dr. Conolly's March 3, 2010 examination of Plaintiff was essentially normal although his lumbar spine had bilateral tenderness. T.451. On examination, Plaintiff's affect was labile and negative for anhedonia. He was not anxious, did not exhibit compulsive behavior, had normal knowledge and language, was not in denial, was euphoric, was not fearful, had flight of ideas, did not have thoughts of grandiosity, denied hallucinations and hopelessness, had increased activity, had no mood swings, and had no obsessive thoughts or paranoia. T.451. She advised to him to participate in activities as tolerated. T.452.

On June 2, 2010, Plaintiff described symptoms of a major depressive episode to Dr. Conolly. T.453. Psychiatrically, Dr. Conolly found that Plaintiff's affect was labile and negative for anhedonia. He was not anxious and did not exhibit compulsive behavior. He was not euphoric or fearful; did not have flight of ideas; had normal knowledge; and was not forgetful. He did have

-10-

mood swings, poor attention span and concentration, and pressured speech. T.454. The doctor advised Plaintiff to continue taking his medications and to follow his exercise program. T.455. She noted he was compliant with his therapy. T.454.

On June 28 2010, Plaintiff was examined by David J. Valvo, D.P.M., who diagnosed hammertoes and recommended athroplasty of the middle phalanx of both second toes. T.461-63. Dr. Valvo noted that Plaintiff had full muscle strength and normal muscle tone. T.462.

**B.   Vocational Evidence**

Plaintiff had past work as a counselor in 1998, and as a food service manager from 2004 to 2005. T.153 Vocational expert J. Douglas Brooks ("the VE") testified Plaintiff's  food service manager position was light, skilled work. T.35-36. The ALJ asked the VE to assume an individual of Plaintiff's age and with his education and past work experience, who is limited to light work; can occasionally climb ramps, stairs, ropes, ladders and scaffolds; can occasionally do some climbing; can occasionally kneel, crawl, frequently balance, stoop and crouch; and is limited to simple, routine repetitive tasks. T.36. The VE testified that such a person could not perform Plaintiff's past work. T.37. The ALJ added the following limitation—that the individual would need to have only occasional interaction with co-workers, public and supervisors, and would need to be able to sit and stand as needed. T.37. The ALJ asked the VE if such an individual could perform other work in the

national economy. The VE testified that the individual could work as a small parts assembler, Dictionary of Occupational Titles ("DOT") Code No. 713.687-018, of which there are 3,200 in the region and 72,000 nationally; surveillance system monitor, DOT Code No. 379.367-010, of which there are 1,800 in the region and 71,000 in the national economy; and, inspector of small parts, DOT Code No. 733.687-062, of which there are 1,800 jobs in the region and 74,000 in the national economy. T.37-38. All of these jobs are sedentary and unskilled. T.38.

## IV.  Standard of Review

Title 42 U.S.C., § 405(g) authorizes district courts "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." This Court's function is not to determine de novo whether a claimant is disabled, Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (citation omitted), but rather to evaluate whether the Commissioner applied the correct legal standard in making the determination and, if so, whether such determination is supported by substantial evidence in the record. E.g., Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citing 42 U.S.C. § 405(g)).

This Court must independently determine if the Commissioner applied the correct legal standards in determining that the claimant is not disabled. See Townley v. Heckler, 748 F.2d 109, 112

(2d Cir. 1984). "Failure to apply the correct legal standards is grounds for reversal." Id. Therefore, this Court first reviews the Commissioner's application of the pertinent legal standards, and then, if the standards were correctly applied, considers the substantiality of the evidence. See Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987) (stating that "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles").

## V.   Eligibility for SSI

A claimant must establish that he is disabled when applying for SSI. To establish disability under the Act, a claimant bears the burden of demonstrating (1) that he has been unable to engage in substantial gainful activity by reason of a physical or mental impairment that has lasted or could have been expected to last for a continuous period of at least twelve months, and (2) that the existence of such impairment has been demonstrated by evidence supported by medically acceptable clinical and laboratory techniques. 42 U.S.C. § 1382c(a)(3); see also Barnhart v. Walton, 535 U.S. 212, 215 (2002).

To determine disability, the Commissioner uses a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520, 416.920. The

burden of proof is on the claimant at the first four steps of the evaluation. Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996). If the claimant establishes that he is unable to perform any of his past relevant work, there is a limited burden shift at the fifth step to the Commissioner, who must determine whether the claimant is capable of performing other work that exists in significant numbers in the national economy. 20 C.F.R. §§ 404.1520, 416.920. In making her decision, the ALJ must consider "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (quotation omitted).

## VI. The ALJ's Decision

### A. Steps 1 and 2

At step 1, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 11, 2009, the amended onset date. At step 2, the ALJ determined that Plaintiff has the following severe impairments: degenerative disc disease, hammertoes, bipolar disorder, anxiety disorder, status post-shoulder repair, degenerative joint disease, depression, and hypertension.

### B.   Step 3

#### 1.   Physical Impairments

At step 3, the ALJ considered Musculoskeletal System Listings 1.02 (Major dysfunction of a joint(s) (due to any cause)) and l.04 (Disorders of the spine). With regard to Listing 1.02, the ALJ found that the objective medical evidence failed to demonstrate that Plaintiff has experienced dysfunction of a major peripheral weight-bearing joint which has resulted in his inability to ambulate effectively, as defined in l.00B2b. Similarly, the objective medical evidence failed to demonstrate that Plaintiff has experienced dysfunction of a major peripheral joint in each upper extremity resulting in his inability to perform fine and gross movements, as defined in l.00B2c. With regard to Listing 1.04, the ALJ found that the medical record did not demonstrate that Plaintiff has experienced, as a result of his back impairment, nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication. T.15-16.

#### 2.   Mental Impairments

The ALJ then found that Plaintiff's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of Listings 12.04 (Affective disorders), 12.05 (Bipolar disorder), and 12.06 (Anxiety disorders). In making this finding, the ALJ considered whether the "paragraph B" criteria (the "paragraph D" criteria of listing 12.05) were satisfied. To satisfy

the paragraph B criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living ("ADLs"); marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. T.16.

The ALJ found that Plaintiff has no more than mild restrictions in his ADLs. Although Plaintiff alleged difficulty with getting out of bed at times, the ALJ noted that he is able to dress and shower, and do some cooking and laundry. T.16. With regard to social functioning, the ALJ found that Plaintiff has moderate restrictions in his capacity to interact independently, appropriately, and effectively on a sustained basis. The ALJ noted that Plaintiff alleged excessive mood swings and difficulty with meeting social obligations because of his depression. With regard to maintaining concentration, persistence, and pace, the ALJ found that Plaintiff has moderate restrictions, based upon his allegations of difficulty in completing tasks and of sleep disturbances. Finally, the ALJ found that the medical evidence did not indicate that Plaintiff had experienced episodes of decompensation which have been of extended duration. Because Plaintiff did not have least at two "marked" limitations, or one "marked" limitation accompanied by "repeated" episodes of decompensation, each of extended duration, the "paragraph B"

criteria (the "paragraph D" criteria of Listing 12.05) were not satisfied.

### 3.   Residual Functional Capacity

The ALJ considered all of Plaintiff's symptoms and the extent to which they reasonably could be accepted as consistent with the objective medical and other evidence and found that he has the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. § 416.967(a) with the following restrictions: he can only occasionally climb ramps, stairs, ladders, ropes, or scaffolds; he can occasionally kneel and crawl; he can frequently balance, stoop, and crouch; he should be limited to simple, routine, and repetitive tasks; he should be limited to occasional interaction with coworkers, supervisors, and the general public; and he should be limited to low stress jobs, defined as jobs with no changes in work setting or work routine.

### D.   Step 4

At step 4, the ALJ found that Plaintiff had past relevant work as a food service manager, which the VE testified is skilled in nature and requires a light level of exertion, both as actually performed by Plaintiff and as performed generally. Accordingly, the ALJ found, the physical demands and mental demands of this job exceeded Plaintiff's RFC.

**E.    Step 5**

At step 5, the ALJ determined that Plaintiff was a younger individual (46 years-old) as of the date his application was filed. To determine the extent to which Plaintiff's limitations erode the unskilled sedentary occupational base, the ALJ asked the VE whether jobs exist in the national economy for an individual with Plaintiff's age, education, work experience, and RFC. Based on the VE's testimony, summarized above in this Decision and Order, the ALJ found that there were a number of jobs in the national economy that Plaintiff could perform. Accordingly, the ALJ found, Plaintiff has not been under a disability since March 11, 2009.

**VII. Discussion**

**A.    Erroneous RFC Assessment**

Plaintiff asserts that in arriving at her RFC assessment, the ALJ "picked and chose" only evidence that supported a finding of no disability; substituted her own opinion for an expert medical opinion; and failed to properly weigh the consultative psychologist's opinion.

**1.    Selective Reading of the Record**

Plaintiff notes that in making her determination regarding the extent of his mental health impairments, the ALJ selectively discussed the evidence. T.19. In her decision, the ALJ mentioned two dates on which Plaintiff received treatment for his mental health issues, November 9, 2009, and December 7, 2009. Plaintiff

contends that the ALJ "ignore[d] the remaining treatment notes detailing the roller-coaster effect of Plaintiff's mental health issues."

An ALJ is not required to explicitly set forth and analyze every piece of conflicting evidence in the record. See, e.g., Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983) ("When, as here, the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.") (citations omitted); Miles v. Harris, 645 F.2d 122, 124 (2d Cir. 1981) ("Notwithstanding the apparent inconsistency between the reports of [two doctors], we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony . . . .").

Looking at the totality of the evidence, in particular, Dr. Conolly's treatment notes over the course of her therapeutic relationship with Plaintiff, it appears that his symptoms are well controlled by his medication and physical exercise regimen. Indeed, a number of Plaintiff's alleged subjective symptoms of bipolar depression and anxiety were not observed by Dr. Conolly during her clinical psychiatric examinations of Plaintiff; she consistently noted, especially during his more recent appointments, that he was not suffering from anhedonia, was not anxious or fearful, did not

exhibit compulsive behaviors, and had normal judgment and insight. In short, the Court cannot agree that the ALJ improperly disregarding pertinent evidence in arriving at Plaintiff's mental RFC.

### 2. The ALJ's Alleged Substitution of Her Opinion for Dr. Jones' Opinion

Plaintiff cites the following portion of consultative psychologist Dr. Jones' report, arguing that the ALJ failed to incorporate these limitations into her RFC assessment:

> He cannot follow and understand simple directions, learn new tasks, or perform complex tasks independently. It is unclear if he can perform simple tasks independently or relate adequately with others. . . .

T.365. The ALJ stated that she considered Dr. Jones' opinion but then noted, "[T]here is nothing contained within the objective medical evidence of record regarding the claimant's mental health issues to support such conclusion. In fact, evidence demonstrates that the claimant is doing well with the medications used to treat his mental health symptoms." T.20. Plaintiff asserts that, to the contrary, "[t]he mental status exams supplied by Plaintiff's treating source show that he was continually exhibiting symptoms such as anxious or fearful thoughts, poor concentration, indecisiveness, depression and more which would support Dr. Jones' functional limitations." Plaintiff's Memorandum ("Pl's Mem.") at 14.

The Court finds that the ALJ did not err in giving little weight to Dr. Jones' opinion that Plaintiff could not follow or understand even simple directions because it was inconsistent with the overall record. T.20. Indeed, as the ALJ noted, Dr. Jones reported that Plaintiff exhibited full range of affect, had intact attention and concentration, had fair insight, and displayed adequate judgment. T.19 (citing T.364-65). The excerpt from Dr. Jones' report, quoted above, appears to inconsistent with her report as a whole. Dr. Jones noted that Plaintiff had to have the instructions for repeating three objects from memory explained to him 3 times. "But then," she noted, he was "able to do 3 objects immediately and 2 out of 3 after five minutes." T. 364. Thus, although he did have some difficulty processing the instructions at first, he was able to do so and complete the exercise.

Moreover, Dr. Conolly's treatment notes consistently indicate that Plaintiff was compliant with his therapy and prescription regimen, and that his bipolar disorder and anxiety were well controlled with medication. See T.389, 393-94, 396-97, 431-32, 433, 454. Thus, Plaintiff clearly had the capacity to understand and follow Dr. Conolly's instructions related to his care. T.20. In addition, Plaintiff informed Dr. Jones that he was able to care for his personal needs, cook, prepare foods, clean, launder his clothing and drive. T.365. Plaintiff's ability to perform these basic activities, as well as to follow his physician's medical

advice, is not consistent with Dr. Jones' opinion that Plaintiff was unable to follow or understand even simple directions.

### 3. Failure to Assign a Specific Weight to Dr. Jones' Opinion

Plaintiff claims that the ALJ failed by explicitly indicating how much weight she assigned to Dr. Jones' consultative psychological assessment (e.g., some weight or little weight). As noted above, the ALJ stated that she had considered Dr. Jones' opinion, but found that there was no objective medical evidence to support the  limitations that Dr. Jones found. T.17. Plaintiff's argument elevates form over substance. The Court easily can discern, from the remainder of the ALJ's decision, that she properly did consider Dr. Jones' opinion, but rejected the portions of it that were unsupported by the record considered in totality. As discussed above, the Court cannot fault the ALJ's decision in this regard.  In any event, the ALJ arguably did incorporate greater limitations in her RFC assessment than found by Dr. Jones, who stated that Plaintiff "can appear to maintain attention and concentration, make appropriate decisions, and appropriately deal with stress." The ALJ, however, limited Plaintiff to a low contact and low stress job, defined as one without changes in routine or work environment.

**B.    Lack of Substantial Evidence to Support the Mental RFC Based on the ALJ's Failure to Credit Dr. Jones' Opinion**

Plaintiff argues that the ALJ created her RFC assessment with no discussion of Plaintiff's function-by-function abilities, particularly as they relate to his mental health. Plaintiff cites SSR 83-10, 1983 WL 31251 (S.S.A. 1983), which defines RFC as follows:

> A medical assessment of what an individual can do in a work setting in spite of the functional limitations and environmental restrictions imposed by all of his or her medically determinable impairment(s). RFC is the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs.

Id. Plaintiff argues that since RFC is a medical assessment, the ALJ is precluded from making this assessment without some expert medical testimony or other medical evidence to support her decision. As Plaintiff notes, in this case, only Dr. Jones issued a report regarding Plaintiff's mental limitations. Plaintiff contends that because the ALJ apparently disregarded Dr. Jones' opinion, there is no basis for her conclusion that Plaintiff is limited to simple, routine, and repetitive tasks; occasional interaction with coworkers, supervisors and the general public; and low stress jobs. T.17.

Plaintiff reads the phrase "medical assessment" too narrowly. According to Plaintiff, because SSR 83-10 uses the term "medical assessment" to describe an RFC, there is an implicit requirement

that such an assessment be based on "expert medical testimony"–here, Dr. Jones' consultative report. Plaintiff, however, cites no caselaw, regulation, SSR, or other policy statement setting forth such a limitation. Courts in this Circuit have rejected similar attempts to draw a distinction between "medical opinions" and the remainder of the evidence in the administrative record. See, e.g., Sickles v. Colvin, No. 12-CV-774 MAD/CFH, 2014 WL 795978, at *4 (N.D.N.Y. Feb. 27, 2014) (quoting 20 C.F.R. § 404.1527; footnote omitted; alterations in original). "A medical opinion, for purposes of an ALJ's disability determination, is defined as evidence, submitted to or obtained by the ALJ, containing 'statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [] symptoms, diagnosis and prognosis,' the claimant's capabilities despite the impairment(s), and any physical or mental restrictions." Id. Thus, "[t]he regulatory language provides ample flexibility for the ALJ to consider a broad array of evidence as 'medical opinions.'" Id. (citing 20 C.F.R. § 404.1527); see also 20 C.F.R. 416.927. Based on the Court's review of the aggregate record of Plaintiff's mental health treatment–including the portions of Dr. Jones' opinion that were consistent with the record as a whole–substantial evidence supports the ALJ's finding regarding Plaintiff's mental RFC.

-24-

## C.  Failure to Allow Plaintiff to Testify at a Supplemental Hearing

Plaintiff argues that the ALJ should have determined that he adequately alleged "good cause" for his failure to appear at the hearing. He contends that by failing to hold a supplemental hearing, she failed in her duty to develop the record because she did not allow him to "fill in gaps in the evidence" with his testimony. Pl's Mem. at 23.

"HALLEX I-2-4-25(B) establishes that 20 C.F.R. §§ 404.911 and 416.1411 control with respect to establishing good cause." Neuzil v. Astrue, No. 2:12-CV-00034, 2013 WL 2445212, at *6 (M.D. Tenn. June 5, 2013). The regulations indicate that examples of circumstances where good cause may exist include, but are not limited to, the following situations: (1) the claimant was "seriously ill" and was "prevented from contacting [the SSA] in person, in writing, or through a friend, relative, or other person"; there was a death or serious illness in the claimant's immediate family; the claimant was given incorrect information; or unusual or unavoidable circumstances exist. Id. at n. 9 (quoting 20 CFR §§ 404.911 and 416.1411). Feeling "harried" clearly is not sufficient to constitute "unusual circumstances" or a "serious[ ] ill[ness]." Although Plaintiff alludes vaguely to being worried about his parents' health issues as they age, there is no indication that either of his parents had died or were seriously ill at the time of the hearing. Therefore, the Court finds that the

ALJ did not err in declining to find that Plaintiff established "good cause" for his absence. Furthermore, the record was sufficiently complete in this case, notwithstanding Plaintiff's failure to testify.

### D.  Erroneous Determination of the Number of Representative Regional Jobs

Plaintiff argues that the ALJ did not fully establish that jobs existed as required in the regulations because the VE failed to provide job numbers specifically for the Western New York region. At the hearing, the VE provided representative jobs and then gave estimates of the numbers of those jobs which existed throughout the country and then throughout the state of New York. T.36-41. The VE stated that he was providing numbers for "the region, that's the state[.]" T.37. In her decision, the ALJ stated that the VE had provided numbers that existed both in the national economy and "locally". T.21. It is here that Plaintiff assigns error to the ALJ.

The Act provides in relevant part that

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot . . . engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him. . . .

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). Furthermore, according to the regulations, a "claimant's inability to obtain such work,

-26-

the unavailability of work in the claimant's local area, or the unavailability of job openings, among others, do not constitute grounds for a disability finding." Colon v. Commissioner of Social Sec., No. 6:00CV0556 (GLS), 2004 WL 1144059, at *7-8 (N.D.N.Y. Mar. 22, 2004) ("The VE testified that there were approximately 100,000 such jobs nationally, and 100 regionally. . . . [T]he ALJ relied on the national job information. Although Colon argues that those jobs are unavailable in the regional economy, the truth of that assertion is irrelevant because it fails to consider the proper legal standard.") (citing 20 C.F.R. §§ 404.1566(c), 416.966(c); internal citation to record omitted); Carvey v. Astrue, No. 06-CV-0737 (NAM/DEP), 2009 WL 3199215, at *15 (N.D.N.Y. Sept. 30, 2009) (similar). Thus, even assuming that ALJ misstated the VE's testimony, the error was harmless.

The case upon which Plaintiff relies, Franklin v. Apfel, 8 F. Supp.2d 227, 234 (W.D.N.Y. 1998) (Curtin, D.J.), does not stand for the proposition he urges—that the Commissioner fails to meet her step 5 burden if she fails to establish the existence of a significant number of jobs in the specific region where the claimant lives. Rather, in Franklin, the district court expressed skepticism about whether 480 surveillance monitor jobs and 206 rental car jobs in the Buffalo region were sufficiently "significant". In that case, even the VE admitted that 480 might not be a sufficient number to constitute a realistic employment

pool, and more accurate census data established that there were no rental car jobs within the county where the claimant lived. 8 F. Supp.2d at 233-34.

## VIII.    Conclusion

For the reasons discussed above, Plaintiff's motion for judgment on the pleadings is denied, Defendant's cross-motion for judgment on the pleadings is granted, and the Commissioner's decision is affirmed. The Clerk of the Court is requested to close this case.

**SO ORDERED.**

S/Michael A. Telesca

_____

HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:    May 30, 2014
          Rochester, New York

-28-